SMITHER & COMPANY, Inc., a corporation, Plaintiff,

v.

CALVIN–HUMPHREY CORPORATION, a corporation

and

New Amsterdam Casualty Company, a corporation, Defendants.

Civ. A. No. 2083–62.

United States District Court District of Columbia.

July 10, 1964.

Mark P. Friedlander, Friedlander & Friedlander, Washington, D. C., for plaintiff.

Harry L. Ryan, Jr., Ralph F. Berlow, Washington, D. C., for defendants.

YOUNGDAHL, District Judge.

Plaintiff's claim and defendants' counter-claim came on for trial before this Court sitting without a jury, on April 22, 23, 24, 25, and 28, 1964. Subsequent thereto, both plaintiff and defendants filed memoranda at the request of the Court, and on May 28, 1964, plaintiff filed a reply memorandum with the permission of the Court after defendants had sought and received additional time for the filing of their memorandum.

The Court has carefully considered the testimony adduced before it (both as it was adduced and in the form of a full transcript), exhibits admitted into evidence, as well as all of the above memoranda, and has reached the following conclusions, which shall be considered as findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure:

1. On June 29, 1962, plaintiff filed suit to enforce a mechanic's lien for labor allegedly performed and materials allegedly furnished on a building at 1800 K Street, N.W. in the District of Columbia. The owner of the building, Calvin-Humphrey Corporation, one of the defendants herein (and referred to hereinafter as defendant), released said mechanic's lien by filing a corporate surety bond, and plaintiff brought suit to enforce the mechanic's lien and named as defendants the Calvin-Humphrey Corporation, the debtor, and the New Amsterdam Casualty Company, as the surety on the bond. No question arises as to the validity of the lien or its release by the filing of a surety bond. Defendant filed an answer and a counter-claim, claiming damages caused by the alleged negligence and incompetence of plaintiff's employees and by the alleged loss of rental income to the defendant as a result of the failure of plaintiff to complete the work by August 15, 1961.

2. The intended agreement between the parties is embodied in plaintiff's exhibit 4, a letter from Paul Burgoldt for Smither & Company (and approved by James M. Smither, president of Smither & Co.) to the Calvin-Humphrey Corporation, attention Mr. William T. Hannan, President. The letter is dated June 2, 1961, and was accepted on June 8, 1961 by Mr. Hannan, who signed the letter in a blank labeled "accepted."

3. Mr. Hannan added to the document, at the bottom of the last page below the above three signatures, the following typewritten words: "WORK TO BE COMPLETED BY AUGUST 15, 1961." This was followed by his signed initials, "WTH." This date of completion was never agreed to by Mr. Burgoldt or Mr. Smither, but they never protested this date. Plaintiff had begun work on the project before June 2, and continued to perform the work with knowledge that defendant had added an August 15 date. The date of August 15 was passed with the work not completed and without an official notification by defendant that it considered the contract breached by plaintiff, and after August 15, defendant made certain change-orders and instructions for additional work to be performed by plaintiff. (Tr. 18; 113–117; 142–145.) Substantial portions of the work set forth in the letter of June 2, as well as certain additional demolition work, were being performed throughout September, 1961. (Tr. 18; 113; 143–144; 347–353; 358; 369; defendant's exhibits 2 and 4.) The Court therefore finds that time was not of the essence of this contract, and to the extent that plaintiff waived its objection to the target date of August 15 by performing work under a document to which this date had been added by Mr. Hannan, to the same extent the defendant waived its right to insist upon completion by August 15 by permitting plaintiff to continue working in September. On October 19, 1961, defendant notified plaintiff "to discontinue any further work * * * for the reason that you have unreasonably delayed the completion of this job." (Plaintiff's exhibit 8.) Plaintiff did no further work, and defendant hired another contractor, E. L. Klavans Co., to complete the job.

4. By October 19, 1961, plaintiff had substantially completed its obligations under the contract. (Tr. 21–28; 127–155.) Delays in completing the demolition and preparation of partitions were caused primarily by delay in receiving final notification of the exact requirements of the incoming tenant, the General Services Administration. (Tr. 29; 51; 118–119; 167; 274–275; 380–381; plaintiff's exhibit 9). Much of the work, such as plastering ceilings and painting, depended upon the final placing of these office partitions. (Tr. 118–119; 126; 167). Defendant therefore breached the contract on October 19, 1961, by dismissing plaintiff from the job. Plaintiff is entitled to all losses sustained as a result of this breach by defendant, less any damage to defendant for improper or negligent workmanship.

5. Plaintiff has proven by a fair preponderance of the evidence that it ex-

pended $11,964.12 for labor. (Tr. 77; 79–80; defendant's exhibit 2.)

6. Plaintiff has proven by a fair preponderance of the evidence that it expended $4,945.70 for materials. (Tr. 78; 80–81; defendant's exhibit 4.) This figure includes the full cost of the fire doors installed, which is the only item disputed by defendant in its memorandum. It is true that the contract of June 2 called for "Class C" doors instead of the "Class B" doors that were installed. But defendant's own witness testified that "the difference is non-existent between a Class C and Class B door." (Tr. 201.) Defendant failed to establish what, if any, difference in price existed between the two types of doors. (Tr. 201; 264–265.) The argument that any replacement of the fire doors was unnecessary under the District of Columbia Code (Tr. 198–201) is irrelevant in view of the requirement of the June 2 contract that they be provided by plaintiff. The total of $4,945.-70 includes $425.54 for plans and permits (including all charges for "prints"). (Defendant's exhibit 4.) If the amount expended on plans and permits is subtracted (for purposes of computing profit, see paragraph 9 below), $4,520.16 remains in the category of materials.

7. Plaintiff has proven by a fair preponderance of the evidence that it expended a total of $25,829.91 for subcontracts. (Tr. 78–79; defendant's exhibit 3; plaintiff's exhibits 2, 7, 14, 15, 16, 18a and b, 21a and b, 22, 23.) Plaintiff submitted to defendant all of its subcontracts and cancelled checks in payment thereof. (Tr. 79–84.) This figure includes payment for all of the subcontracts listed in defendant's exhibit 3 except item (a) below, and specifically includes items (b), (c), and (d) below. These latter three items are the subcontracts which defendant disputes in its memorandum, except for item (a) below and except for the subcontract dealing with air-conditioners, which will be treated separately in paragraph 11 below.

(a) Plaintiff concedes (Tr. 137–139) that the claim of William R. Lone for "supervision" (in the amount of $1,171.10) "could" be a duplication of the charge (in the amount of $562.50) which was paid to Lone on an hourly basis as "superintendent" and which is included in the amount spent for labor (defendant's exhibit 2.) In this state of the evidence, the Court concludes that plaintiff has failed to prove by a fair preponderance of the evidence that it owes Lone the additional $1,171.10, and the Court will disallow this amount in its entirety. Plaintiff does not claim that it is entitled to the $1,200 for "supervision" set forth in the contract of June 2.

(b) The subcontract with the Haughton Elevator Company was orally authorized by defendant, thus modifying the provision in the contract of June 2 that such authorization was to be in *writing.* (Tr. 388–389; plaintiff's exhibit 16.) $4,558 was the cancellation charge for not completing this contract. (Tr. 82; 396–399.)

(c) Plaintiff's payments to Coakley under the plastering subcontracts were amply proven (Tr. 83–84; 90–93) as consisting of $2,670 paid initially and $4,136.02 paid in settlement of a lien filed by Coakley against plaintiff—which taken together total the $6,806.02 which plaintiff claims. However, since this is more plastering than was called for in the June 2 contract, and since plaintiff has failed to prove by a fair preponderance of the evidence that the additional plastering was authorized by defendant (Tr. 140–141; plaintiff's exhibits 17a, b, c, and d), plaintiff will be limited to the amount set forth in the June 2 contract, namely, $5,100.

(d) The electrical work was performed according to the terms of the June 2 contract, but when plaintiff was dismissed from the job, portions of the subcontract were still incomplete, which portions were completed under the successor contractor. (Tr. 26; 64–67;

149.) Plaintiff has charged only for the portions of the work completed while it was the general contractor and paid out by it, namely $643.90. (Tr. 149; 380–384.) The argument that the type of fire alarm system called for by the contract with defendant and installed by the subcontractor was more expensive than another system which might have been permitted under the District of Columbia Code is irrelevant. (Tr. 64–67; 211–212; 262–264.)

8. Plaintiff seeks to recover an amount for "Overhead"—namely, 10% of the amounts expended for labor, materials, insurance, and subcontracts. However, the proposal of June 2, 1961 (plaintiff's exhibit 4), which became the contract when accepted by defendant, contains no specific provision for overhead. The absence of any provision for overhead as such in the June 2 contract is partly explained by reference to a proposed contract (which was rejected by defendant) dated May 12, 1961. (Defendant's exhibit 1.) In the first place, the proposal of May 12, submitted by Mr. Burgoldt, contained a provision for overhead in the amount of 5% on certain items, and while the entire proposal was not acceptable to either Mr. Smither or Mr. Hannan, there was no specific objection to the figure of 5%. (Tr. 40–45; 295.) Some explanation of an increase in the amount to 10% would therefore be required before the Court would conclude that any such provision was included, *sub silentio*, in the agreement eventually reached by the parties, but plaintiff has offered no such explanation. This unexplained difference in the percentages is made even more important by the fact that in early May, defendant's president signed a written authorization to Mr. Burgoldt "to draw up a contract for approx. $100,000.00 at *5%* + *10%*." (Emphasis added.) (Plaintiff's exhibit 3; Tr. 11–12.) In addition to this difference in the percentages, further comparison of the documents of May 12 and June 2 reveals that for eleven separate items the "projected" totals in the May 12 proposal and the

totals in the June 2 contract are identical (ignoring differences of less than one dollar): Demolition & Preparation, Plumbing, Electric, Terrazzo, Painting, Entrance Doors, Boiler Conversion, Plans, Insurance, Supervision, and Permits. Yet in the May 12 proposal, nine of these items were computed *without* adding 5% for overhead, while only two items—Demolition & Preparation, and Painting—contained such an allowance for overhead. Thus plaintiff's present claim for overhead on *all* items would increase the totals on an item-by-item basis even above the totals of the proposal which defendant rejected as too high. In this state of the evidence, the Court attaches no significance to the fact that defendant did not protest the inclusion of a charge of 10% for overhead on four of plaintiff's requisitions, dated July 10, August 2, September 18, and October 16, 1961 (plaintiff's exhibits 11c, 11d, 11e, and 11f). The Court therefore concludes that plaintiff has failed to prove by a fair preponderance of the evidence that there was any agreement between the parties that plaintiff should be paid anything for overhead, and no such provision will be implied by the Court.

9. Plaintiff seeks to recover an amount for "Profits"—namely, 10% of the amounts expended for labor, materials, insurance, and subcontracts. Here, unlike the facts surrounding the treatment of overhead, there was no variation in the percentage in the course of negotiations. From the first authorization for a contract (plaintiff's exhibit 3), through the rejected proposal of May 12 (defendant's exhibit 1), and through each of plaintiff's requisitions (plaintiff's exhibits 11b, 11c, 11d, 11e, 11f) except the first, which simply ignored profits altogether and which pre-dates the June 2 proposal (plaintiff's exhibit 11b—dated May 24, 1961), the figure for profits was consistently set forth as 10%. Nor is the absence of specific allowance for profits in the June 2 proposal significant in view of the history of the negotiations. Defendant objected to the proposal of

May 12 primarily because it was worded in a way which implied that the total contract figure of $83,970.32 was simply a "projection" which could be exceeded. (Tr. 295.) By contrast, in the June 2 proposal, the "Grand Total cost" of $84,034.00 was described as "a firm figure based on the above specified work." The proposal further described the contract as "a Time and Material Contract" in which "any savings affected [sic] shall reflect as a credit and deducted from the amount $84,034.00." Thus the proposed total cost of $84,034.00 was not to be exceeded except by special authorization for specific items. (Tr. 45–46.) However, within this estimated total cost, and within the estimated figure for each item in the breakdown by type of work (e. g., Demolition & Preparation, $4,192.00; Masonry, $7,824.00, etc.), allowance for profits would not be inconsistent with defendant's insistence upon a figure that would be a ceiling on costs. Indeed, allowance of 10% profit would be consistent with what the construction trade understands to be included in a "time and material" contract. (Tr. 135–137.) In view of the understanding of the trade and in view of the prior negotiations between the parties, the Court has concluded that a provision for 10% profits was agreed to by the parties when they called this a "time and material" contract—provided that the total cost did not exceed the $84,034.00 ceiling. Allowance of profits in the amount of 10% brings the total cost to an amount far below this ceiling. The Court will allow profits to be charged against the total of labor, materials, and subcontracts. However, the Court will disallow profits on insurance, plans, and permits, which items on the contract of June 2 are clearly set apart from the breakdown by type of work (plaintiff's exhibit 4), and which on the proposal of May 12 were identical in amount but had no profit added while all other items (except for "supervision," which was discussed above) had 10% profit added. (Defendant's exhibit 1.)

10. Plaintiff has proven by a fair preponderance of the evidence that it expended $1,138.07 for insurance. (Tr. 77–78.)

11. Plaintiff claims to be entitled to $264.20 for fuel oil. While defendant concedes that if plaintiff is entitled to recover, it is entitled to recover for the fuel oil (defendant's memorandum, p. 10), the above figure includes allowance for 10% overhead and 10% profit. (Tr. 81.) Since the Court is disallowing overhead, plaintiff will be limited on this item to the cost of the fuel oil ($218.35, derived arithmetically) plus 10% profit ($21.84), or a total of $240.19.

12. The Court finds that the subcontractor did not complete the cleaning and repairing of 106 air-conditioning units, as called for in the subcontract. (Plaintiff's exhibit 6.) The units were not in working order, and indeed little if any work had been done on them, when they were returned to the premises (Tr. 216–217; 278–280), although all of the 106 units which were taken were returned. (Tr. 279.) Plaintiff is therefore not entitled to recover any of the $2,650. (on the basis of $25. per unit) set forth in the subcontract.

13. It is stipulated that defendant made the following three payments to plaintiff:

| | |
|---|---|
| July 12, 1961 | $2,717.77 |
| July 14, 1961 | 11,135.77 |
| August 14, 1961 | 12,000.00 |
| TOTAL RECEIVED BY PLAINTIFF | $25,853.54 |

14. Based upon the above findings and conclusions, the following computation represents the amount defendant owes plaintiff, excluding any deductions:

for defective work and excluding any additions for loss to plaintiff of anticipated profits, both of which items will be considered below in paragraphs 15 and 16.

| | |
|---|---:|
| LABOR | $11,964.12 |
| MATERIALS | 4,520.16 |
| SUBCONTRACTS | 25,829.91 |
| | $42,314.19 |
| +10% PROFIT | 4,231.42 |
| | $46,545.61 |
| + INSURANCE | 1,138.07 |
| + PLANS & PERMITS | 425.54 |
| + FUEL OIL | 240.19 |
| | $48,349.41 |
| LESS PAYMENTS RECEIVED | −25,853.54 |
| TOTAL OWING TO PLAINTIFF ON PLAINTIFF'S CLAIM | $22,495.87 |

15. The Court finds that plaintiff is not entitled to any additional amount for anticipated profits on the portions of the work yet to be completed at the time defendant wrongfully terminated the contract. Although the Court has concluded that there were not enough deficiencies in plaintiff's work to justify defendant in terminating the contract (see above, paragraph 4), the Court has nevertheless concluded that there was enough improper workmanship (see below, paragraph 16) and enough work left incomplete without justification (see above, paragraph 12, concerning the subcontract for repair of air-conditioning units) to make the amount that plaintiff would have been entitled to receive if plaintiff had been permitted to complete the full contract with defendant much too speculative and uncertain to constitute the basis for a computation of anticipated profits.

16. On the counterclaim, defendant has proven by a fair preponderance of the evidence that it had to spend the following amounts of money to correct the following items of work which plaintiff left imperfectly done:

| | |
|---|---:|
| Refinishing 1500 square feet of plaster (Tr. 190–191) | $225.00 |
| Restoring concrete stoop in front of premises to receive terrazzo flooring (Tr. 201–202) | 291.00 |
| Unnecessary destruction of existing moulding and trim (Tr. 198) | 417.34 |
| TOTAL OWING TO DEFENDANTS ON COUNTERCLAIM | $933.34 |

The remainder of the items claimed in the counterclaim have not been proven by defendant by a fair preponderance of the evidence. The cost of repairing the chute (Tr. 187) cannot be recovered because plaintiff would be entitled to offset the reasonable value of the materials, which defendant has failed to estimate. No amount is estimated for damage due to unnecessary exposure to

the elements (Tr. 204) or due to improper pouring of concrete (Tr. 195). The amount of window sash unnecessarily destroyed is not estimated (Tr. 196–7), and in any event, it may have been cheaper to use new sash, as plaintiff testified. (Tr. 170.) The lobby was probably damaged when the previous tenants vacated the premises. An employee of the successor contractor disagreed with plaintiff's approach to some of the work (such as the flooring, Tr. 193, 206, 228, 251–254), or thought the contract between plaintiff and defendant contained unnecessary items. Simply because the successor contractor (who had submitted a bid in competition with plaintiff) would have done the work differently or would have recommended against certain provisions of the contract is no ground for claiming that defendant has been damaged when plaintiff completed the provisions of the contract as written. Other damages, not mentioned above, were simply the necessary result of the kind of demolition work which plaintiff agreed to do, such as some of the replastering (Tr. 189–190; 271), some breakage (Tr. 202–203), and some pipes and electric wires left exposed (Tr. 207; 301). Furthermore, most of the demolition work which the successor contractor performed was in addition to the work contracted for, and completed, by plaintiff. (Tr. 234–246.) Defendant did not establish that there was any loss of rent from the incoming tenant, or that if there was that it was caused by any delay attributable to plaintiff. Defendant has therefore failed to prove by a fair preponderance of the evidence any more than the three items set out above, totaling $933.34.

On the basis of the above findings of fact and conclusions of law, plaintiff is entitled to recover the sum of $22,495.87 on its claim, and defendant is entitled to recover the sum of $933.34 on its counterclaim, making a net amount of $21,562.53 which plaintiff is entitled to recover. Judgment will be entered accordingly.